NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 11, 2018
Decided January 9, 2019

**Before**

DIANE P. WOOD, *Chief Judge*

KENNETH F. RIPPLE, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 18-1732

| | |
|---|---|
| JOSEPH HAMMERSLOUGH, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 16-2349 |
| NANCY A. BERRYHILL, *Defendant-Appellee*. | Colin S. Bruce, *Judge*. |

**O R D E R**

Joseph Hammerslough is a 44-year-old former paramedic with multiple impairments, including a benign brain tumor, atrial fibrillation, and a history of superficial vein thrombosis. He applied for social security benefits, but an administrative law judge found him capable of sedentary work and denied his applications. Hammerslough failed to obtain relief from the district court and now appeals, asserting that the ALJ improperly evaluated his residual functional capacity by not considering the severity of his headaches or his impairments in combination and by not justifying the finding that he could meet the sitting requirements of sedentary work. Because substantial evidence supports the ALJ's decision, we affirm.

## I. Background

Hammerslough currently lives in Champaign, Illinois in his mother's home. He is obese and has several impairments including a benign brain tumor, atrial fibrillation, sleep apnea, a history of seizures, a history of superficial vein thrombosis, and ptosis (a drooping eyelid). He asserts that he became disabled in May 2010, one year after suffering a mild head trauma (unspecified in the record) and the discovery of a dermoid[1] brain tumor. In mid-2013, he applied for disability insurance benefits and supplemental security income, asserting that he became unable to work on May 11, 2010 due to his impairments. His applications were denied both initially and on reconsideration, and he later requested and received a hearing before an administrative law judge. His date last insured was December 31, 2015. This appeal targets the ALJ's evaluation of his headaches and ability to sit, so we recite only the facts relating to those conditions.

### a. Headaches

In 2009, Hammerslough experienced severe headaches and vomiting and took himself to the hospital. Doctors there examined him and discovered a benign brain tumor. His symptoms eventually resolved, and neurologist Huan Wang opined that the tumor was not likely their cause.

In 2012, Hammerslough reported headaches to doctors at the Christie Clinic, and around that time (the record is not more specific) he obtained a prescription for Percocet to treat those headaches. In early 2013, he began seeing neurologist Barry Riskin. At their first appointment, Dr. Riskin refilled Hammerslough's Percocet prescription. At the second, Dr. Riskin noted that Percocet "appears to be helpful [for his headaches] and is being used sparingly." His notes for the third appointment state that Hammerslough's headaches were frequent but pain control was adequate. And at the last appointment, Dr. Riskin noted his concern that Hammerslough had been having severe early-morning headaches that necessitated taking pain medication.

### b. Sitting

---

[1] As the word suggests, "dermoid" tumors result from the growth of displaced skin, hair, or nail cells, and are typically benign.

Hammerslough was diagnosed with and began treatment for superficial vein thrombosis in 2014. An ultrasound revealed no deep vein thrombosis. He underwent laser ablation treatment with Dr. Jeremy Youse, and afterwards reported doing well, though he said his pain returned within a few days. At his second follow-up, he reported significant relief with a drug called lovenox: when taken as prescribed, he assessed his leg pain as 0 out of 10.

The medical record does not describe any other lower-extremity impairments or sitting-related impairments, nor do any medical experts comment on Hammerslough's ability to sit. At his 2015 hearing before the ALJ, Hammerslough testified that swelling and blood clots in his legs (conditions that he said have gradually worsened over the years) prevented him from sitting for long periods. His mother corroborated his complaints of discomfort, saying that he was "not supposed to sit for more than 45 minutes to an hour" at a time.

### c. ALJ's Ruling

After the hearing, the ALJ applied the standard five-step analysis, *see* 20 C.F.R. §§ 404.1520, 416.920, determined that Hammerslough could perform sedentary work, and found him not disabled. The ALJ found that Hammerslough had not worked gainfully since May 11, 2010 (Step 1); that he had severe impairments, including a brain tumor, a remote history of seizure-like episodes, atrial fibrillation, obstructive sleep apnea, obesity, a history of superficial vein thrombosis, congenital right-side ptosis, and extraocular movement disorder (Step 2); and that these impairments did not equal a listed impairment (Step 3). *See* "Listing of Impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ then concluded that Hammerslough had the residual functional capacity (RFC) to perform sedentary work, subject to additional limitations, and that, although he could not perform any of his past jobs (Step 4), based on the Medical-Vocational Guidelines in 20 C.F.R. Part 404, Subpart P, App. 2, he could perform other jobs available in the national economy (Step 5).

In determining Hammerslough's RFC, the ALJ relied on over thirty treatment records made by more than a dozen treating physicians spanning over five years, as well as the opinion of a consulting physician. The ALJ found that while the medical records indicated mild to moderate impairments, Hammerslough had not met his burden of establishing that he could perform no sustained work activity. The ALJ also discredited Hammerslough's assertions about the severity of his headaches, sleep

apnea, and lower leg pain because the records showed that each was adequately managed by medication or medical devices.

The Appeals Council denied Hammerslough's request for review, and the district court upheld the ALJ's decision.

## II.        Analysis

On appeal, Hammerslough argues that the ALJ erred in evaluating his RFC by failing to substantiate those findings that relate to (1) his headaches, (2) his ability to sit for long periods of time, and (3) the effects of his various impairments in combination. We review the ALJ's decision for substantial evidence, *see* 42 U.S.C. § 405(g), deciding whether the evidence relied upon is such that a reasonable person might accept it as adequate. *Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018).

Hammerslough first disputes the ALJ's finding that his headaches were merely "sporadic," arguing that he complained of headaches at nearly every neurologist appointment. He relatedly argues that the ALJ improperly discounted the severity of his headaches and his need, on their account, to lie down and take Percocet.

These arguments misread the ALJ's rulings. Hammerslough mischaracterizes the ALJ's use of the word "sporadic": the ALJ was not talking about headaches individually, but rather about a whole suite of impairments (dizziness, headaches, difficulty communicating, and falls) when finding that "the medical records show only *sporadic* mention of these complaints." (italics added) The ALJ supported this finding by noting that some of these impairments had virtually no support in the medical records: Hammerslough had no trouble communicating, and no medical exam had ever revealed any balance difficulties. Likewise, Hammerslough's assertion that the ALJ did not consider the effect of his headaches is meritless. The ALJ summarized over thirty relevant medical reports and then proceeded to address and evaluate Hammerslough's headache complaints alongside his most recent neurologist appointments. The ALJ found that his headaches were not continuous and when they did occur, they were well-managed by Percocet.

Hammerslough also argues that the ALJ erred in concluding that he could perform the sitting requirements of sedentary work. He insists that the ALJ did not adequately substantiate the finding that he could sit for the requisite six hours in an eight-hour day and maintains that the evidence shows that he cannot. He says that he

complained to his doctors about his difficulties sitting, pointing out, for instance, that he even had to ask the ALJ for permission to stand during his hearing.

Hammerslough is wrong that the ALJ did not justify the finding that he could meet the sitting requirements. The ALJ discussed the effects and treatment of Hammerslough's superficial venous thrombosis—the only impairment that Hammerslough identified as limiting his ability to sit. The ALJ appropriately relied on the medical records, which show that as recently as January 2015, after a successful laser ablation treatment, Hammerslough's leg pain was at a "0" when he took lovenox as prescribed. Additionally, Hammerslough never complained that he could not sit for long periods of time prior to his hearing, nor are there physicians' notes (let alone diagnoses) to that effect.

Hammerslough also contends that the ALJ failed to adequately consider the combined effect of his various impairments. He asserts that the ALJ considered his impairments only separately, and then afterwards, in summary fashion, "simply lumped eight conditions together." He adds that the ALJ should have asked a medical expert to evaluate the effects of his impairments taken together.

The ALJ discussed the combination of Hammerslough's impairments three times, though it is fair to say he did not say much. His first discussion of the combined effect of Hammerslough's impairments is in the context of obesity. The ALJ noted that "obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." In this case, the ALJ found that it did not. In two other instances, the ALJ addressed Hammerslough's impairments in combination. First, he found that Hammerslough's tumor, sleep apnea, atrial fibrillation, complaints of dizziness, and headaches limited him to sedentary jobs "that do not require climbing ladders, ropes, or scaffolds or even moderate exposure to hazards." He also found that the combination of obesity, superficial venous thrombosis and leg pain limited him to sedentary work "with only occasional postural functions." The ALJ could have said more, but what he said is sufficient, given the impression left by the medical record that Hammerslough's impairments are generally well controlled.

Finally, Hammerslough argues that the ALJ erred in evaluating his credibility. Hammerslough points out that the ALJ discounted his claims as "not entirely credible"—a phrase that this court repeatedly has derided as "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

The phrase "not entirely credible" is meaningless boilerplate only when the ALJ substitutes it for a proper, full-bodied explanation of why credibility is lacking. Here, the ALJ went on to identify and explain all of his credibility findings and grounded each of them in the record. For example, the ALJ found Hammerslough's testimony of continuous, debilitating headaches to be contrary to reports that Hammerslough told his neurologist Dr. Riskin that he took his headache medicine (Percocet) "no more than twice a week," and that "pain control is generally adequate." The ALJ found his assertion of severe balance issues not credible, because despite multiple exams, the medical records did not reveal balance problems. The ALJ found his assertion that he has difficulty communicating unsupported, because Hammerslough never discussed communication difficulties with his physicians, and the medical records showed that he communicated normally. Finally, the ALJ found not credible Hammerslough's assertion that his blood clots had worsened and prevented him from sitting; the medical records showed that his superficial vein thrombosis treatment was successful and that he experienced no pain so long as he took his prescribed medication. Because "we give the ALJ's credibility finding 'special deference' and will overturn it only if it is 'patently wrong,'" *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (quoting *Eichstadt v. Astrue*, 534 F.3d 663, 667–68 (7th Cir. 2008)), we will not disturb the ALJ's credibility findings here.

AFFIRMED